### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

| | |
|---|---|
| Jacquelyn D. Miller, | |
| Plaintiff, | Case No. 3:19-cv-50341 |
| v. | Honorable Iain D. Johnston |
| Express, LLC, | |
| Defendant. | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Jacquelyn Miller brings this action asserting age discrimination (Count I), harassment (Count II), and retaliation (Count III) under the Age Discrimination in Employment Act and the Illinois Human Rights Act. She also claims interference with her rights under the Family and Medical Leave Act (Count IV) and retaliation (Count V) for asserting those rights. Defendant Express, LLC moves for summary judgment on all counts. For the reasons explained below, that motion is granted. Express is entitled to judgment as a matter of law.

### I.    Background

The following is a brief introduction to the facts, taken in the light most favorable to Miller, the nonmovant. At this stage, the Court tells "the most persuasive story possible on the non-movant's behalf" and asks "whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020).

Miller began working for Express in November 2012, as a part-time sales

associate. Miller Dep. 33:24, 34:1–6. At the time of her hiring, Miller was forty-two years old. Dkt. 73, ¶ 16. Later, she was promoted to a part-time sales lead position and then to the co-manager role. Miller Dep. 40:2–4, 43:18–20. The local management team consisted of one store manager; a co-manager, who was a subordinate of the store manager; and then multiple sales leads that acted as part-time management employees. *Id.* at 36:12–24, 37:1–22. In 2017, Ebonni Barfield was the store manager, and Miller was the co-manager. Megan Wright and Diana Romero were both sales leads and rounded out the local management team. Dkt. 74, ¶ 4. Barfield had been hired that year—in July 2017—and, at some point, made a few "out with the old, in with the new" type remarks. *Id.* ¶ 2. Specifically, Miller stated in her deposition that she overhead Barfield commenting three separate times that she was hired "to clean house of the old employees," that she was "going to get rid of the old people," and that she was "going to get rid of old employees." Dkt. 74, ¶ 7. Miller Dep. 209:21–24.

Although Miller sees these as ageist comments, Barfield contends that she had no such intention. Barfield Dep. 116:22, 117:1–13 ("Old just meaning, like the old associates. Like I stated, when I got there, Jackie was complaining about tenured associates, older associates that had been there that were not doing their job. So I said, hey, like, well, let's go ahead and start the write-up process and go ahead and move them out and get new people in. That was it."). At the time, Miller was the oldest employee at the store (she was forty-seven), and only one other employee was over age forty. Dkt. 74, ¶ 3. As an older employee, Miller felt she was

treated differently. She took issue with being scheduled with only one other employee on busy nights, being left alone on the sales floor for hours at a time, and felt isolated from others. *Id.* ¶¶ 8–9. Still, Miller was the co-manager and could have instructed other employees to help her. Miller Dep. 141:14–17. Furthermore, the store usually operated with a minimal staff. On a typical day, only two employees were working, and busier days would only require three or four. *Id.* at 143:15–24, 144:1–19.

On October 7, 2017, Miller filed a complaint with Express' ethics hotline. In it, she complained of what she perceived as harassment and discrimination. Specifically, she complained about the number of nights she was being scheduled to close the store. She was unhappy about being denied time off because Barfield was taking that same time off. She further complained of interpersonal problems, favoritism, and lack of assistance with the tasks of her job. Dkt. 66-2 (documentation regarding ethics report); Dkt. 73, ¶¶ 33–37.

The complaint prompted an investigation by Claudine Colpoys, Human Resources Manager, and Rebecca Ruska, District Manager. Dkt. 74, ¶ 10. They interviewed associates and the local management team. Dkt. 73, ¶ 38. Soon after they began the investigation, Ruska and Colpoys pivoted and became concerned with Miller's time records. Dkt. 74, ¶ 12. During this process, however, Miller never alleged that she was being discriminated against because of her age. These various work problems seem to have caused Miller significant stress. Dkt. 66-2. On October 27, Miller reported that she was unable to come into work due to the stress of the

workplace. Barfield was already scheduled to be off that day, so she informed Ruska (district manager) of the situation. *Id.* ¶ 14.

Unrelated to that stress, Miller contacted Unum, Express' third-party Family and Medical Leave Act (FMLA) administrator on November 30, 2017. She stated her intention to take FMLA leave to care for her father, who had been diagnosed with cancer. Unum later sent multiple letters to Miller, attempting to obtain the necessary medical certification. Miller never responded to those letters. After multiple extensions of time, Unum denied Miller's leave request. *Id.* ¶ 15; Dkt. 66-25. Before Unum denied her FMLA leave, however, Miller's employment with Express was terminated.

Soon after she called Unum, Miller violated Express' policy against working off the clock. That policy requires that employees restrict their work activities to only times in which they are clocked in. If they fail to meet that expectation, or fail to properly log the hours later, the company will terminate their employment without a verbal warning. *Id.* ¶ 19; Barfield Dep. 123:22–24, 124:1–3; Dkt. 73, ¶ 8. The policy seems clear enough, but in practice is less so. The parties apparently dispute what constitutes a violation. As Miller sees it, the policy was commonly violated because people texted about work all the time. Dkt. 74, ¶¶ 24–25. The record contains text messages from Barfield that show she texted about work related issues at various times of the day. Dkt. 66-22. Still, Barfield sees those text communications as falling short of violations because she was not actively doing anything in response to them (meaning she never actively changed schedules in

4

those messages).[1] Barfield Dep. 77–79, 121–22.

Regardless, the undisputed facts show that Miller violated the policy. On December 2, 2017, a shipment of merchandise came in that needed to be processed. Miller scheduled two individuals (both named Oscar) to process that shipment. But when another employee (Ariana Sanders) told Miller that she could work that day instead, Miller changed course. Believing that Sanders was the better choice, Miller called at least one of the Oscars and left a voicemail informing him not to come in. Dkt. 74, ¶ 20. Later, the employee played the voicemail for Ms. Romero (one of the members of the local management team), who then brought it to the attention of Barfield, who then contacted Ruska, the district manager. *Id.* ¶¶ 21, 32. Ruska then initiated an investigation into whether Miller had violated the working off the clock policy. *Id.* ¶ 23. Ruska later informed Barfield that she would take the issue to human resources because it was a policy violation. Barfield Dep. 82:9–13.[2]

Miller was fired on December 19, 2017, for violating the prohibition against working off the clock. *Id.* ¶ 33. Although Miller believes Barfield was involved in the decision to fire her, she admits that she does not know who made the decision. *Id.* ¶ 34. Notwithstanding Miller's belief that Barfield was involved in the decision-making process, the evidence shows otherwise. After learning about the violation, Ruska contacted Colpoys (human resources) and Martha Maranelli, the regional manager, to begin an investigation into the alleged violation. Dkt. 73, ¶ 58. On

---

[1] For clarification, the policy applied to Barfield as well, even though she was a salaried employee. Colpoys Dep. 117:1–20.

[2] A reasonable person might find this reaction of the fellow employees and the employer to be petty. But there's nothing illegal about simply being petty.

December 19, 2017, Ruska called Barfield and asked her to get on a phone call, with Miller present, to discuss the result of the investigation. Though Ruska spoke to them over the telephone, Miller and Barfield were in person together in the manager's office. During that call, Miller admitted to violating the working off the clock policy. Ruska then informed her that Express was terminating her employment due to the policy violation. Ruska Dep. 84:5–11.

The testimony regarding the meeting is not entirely consistent. Ruska saw it as a quick discussion. *Id.* Barfield, in a slightly different take, stated that both Ruska and Colpoys were on the phone and that after Miller admitted to the violation, they told Miller that they would review the situation and call back in a couple hours with their final decision. Barfield 86:2–16. She further explained that Ruska and Colpoys called back later and offered Miller the option of resigning or being terminated, and she chose termination. *Id.* 86:17–24, 87:1–18. Colpoys, on the other hand, cannot remember whether she was on the phone call when Miller was terminated. Colpoys Dep. 119:5–11. Nevertheless, no evidence exists that Barfield was a part of the decision. But Miller believes it to be true because Barfield was in the room when the phone call took place. In response to Express' statement of fact on this point, Miller contended that Barfield was in the room and a reasonable jury could believe she was involved. Dkt. 73, ¶ 61. Other than pointing to Barfield's presence in the room, Miller admits that she doesn't really know who made the decision. *Id.* ¶ 67. According to Ruska, however, the decision did not involve Barfield. Ruska Dep. 71:6–12.

## II.     Analysis

Summary judgment is warranted if the evidence presents no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The Court must "construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013) (quoting *Goetzke v. Ferro Corp.*, 280 F.3d 766, 774 (7th Cir. 2002)). The initial burden lies with the movant to either show an absence of evidence supporting an essential element or to present affirmative evidence showing that an essential element cannot be satisfied. *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016). Then, the burden shifts to the nonmoving party to present evidence that establishes a genuine issue of material fact as to that element. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009) ("Thus, to survive summary judgment, the nonmoving party must present evidence sufficient to establish a triable issue of fact on all essential elements of its case."). Furthermore, a plaintiff's own subjective belief that something is true is not evidence sufficient to defeat a motion for summary judgment. *Vukadinovich v. Bd. of Sch. Trs. of N. Newton Sch. Corp.*, 278 F.3d 693, 700 (7th Cir. 2002).

### a.  Illinois Human Rights Act

In Count I, Miller claims age discrimination under the Age Discrimination in Employment Act (ADEA) and the Illinois Human Rights Act (IHRA). Express moves for summary judgment on Miller's claims under both statutes.

Express combined its argument under the ADEA and the IHRA, contending that the IHRA uses the same *McDonnell Douglas* framework. Dkt. 53, at 5. Miller does not contest this point. Indeed, the Illinois Supreme Court adopted the *McDonnell Douglas* framework in *Zaderaka v. Illinois Human Rights Comm'n*, 545 N.E.2d 684, 687 (Ill. 1989) (recognizing that lower state courts and the Illinois Human Rights Commission adopted the *McDonnell Douglas* framework and that "[t]his court will follow the same approach"). The Seventh Circuit has recognized the same. *Bagwe v. Sedgwick Claims Mgmt. Servs.*, 811 F.3d 866, 880 n.39 (7th Cir. 2016) ("We therefore accept Ms. Bagwe's contention that the claims should be assessed under the same framework."). Thus, the Court will apply the same reasoning to Miller's claim under Illinois Human Rights Act that it reaches for Miller's claim under the Age Discrimination in Employment Act.

### b. Age Discrimination

Under the ADEA, an employer may not discharge an employee because of her age. 29 U.S.C. § 623(a)(1). But the ADEA applies only to individuals that are at least forty years old. § 631(a). Unlike the public-employment section of the ADEA, private-sector plaintiffs must establish that age was the but-for cause of the employer's adverse employment decision. *Babb v. Wilkie*, 140 S. Ct. 1168, 1175–76 (2020); *Igasaki v. Ill. Dep't of Fin. & Prof'l Regul.*, 988 F.3d 948, 960 (7th Cir. 2021). Although ADEA claims differ in some respects from Title VII claims, the familiar *McDonnell Douglas* framework remains appropriate. *Igasaki*, 988 F.3d at 960. Under that framework, the plaintiff must first establish (1) that she belongs to a

protected class, (2) that she met her employer's legitimate expectations, (3) that she suffered an adverse employment action, and (4) that other similarly situated employees outside of her protected class received better treatment. *Id.* at 957.

If the plaintiff establishes that prima facie case, the burden shifts to the defendant-employer to show a legitimate, nondiscriminatory reason for the adverse employment decision. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021). If the defendant-employer meets that burden, then the plaintiff must present "evidence that the employer's explanation is pretextual." *Id.* (quoting *Carson v. Lake Cnty.*, 865 F.3d 526, 533 (7th Cir. 2017)). Here, only the second and fourth elements of Miller's prima facie case are in dispute.

Though that test is appropriate, the Seventh Circuit has explained that, at bottom, the correct legal question "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's" status as a member of a protected class "caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Express first argues that Miller cannot make her prima facie case under the *McDonnell Douglas* framework because she cannot establish that she was meeting its legitimate expectations. Dkt. 53, at 6. In support, it points out that Miller was discharged for violating Express' working off the clock policy. *Id.* Miller admits to the policy violation. But she contends that she was still meeting Express' legitimate expectations because other employees violated the same policy and were not disciplined. She further asserts that she received no discipline during her time at

9

Express and was instead promoted to the role of co-manager. Dkt. 71, at 13. To begin, the proper question is whether Miller was meeting her employer's legitimate expectation at the time of the adverse employment action, not throughout her employment. *Fortier v. Ameritech Mobile Communs.*, 161 F.3d 1106 (7th Cir. 1998) ("The record indicates that Mr. Fortier had received positive performance evaluations in the years prior to Aguina-Tudela's negative evaluation; we must keep in mind, however, that the relevant time to consider is the time of discharge."). Thus, her assertion that she had a clean record and had been promoted does not foreclose Express' contention that Miller failed to meet its legitimate expectations.

Miller's argument appears to be that Express cannot rely on her failure to follow arbitrarily enforced policies. Dkt. 71, at 12–13. Express does not meaningfully respond to this argument, though the evidence suggests a disagreement regarding what conduct constitutes a violation of the policy. Express instead reiterates that Miller violated a serious policy and that the violation was a terminable offense. But that is not the end of the discussion.

In *Flores v. Preferred Tech. Group*, the employee was covered by a collective bargaining agreement that prohibited unauthorized breaks and work stoppages. 182 F.3d 512, 513 (7th Cir. 1999). There, a group of employees, dubbed the "coffee room rebellion," were "accustomed to taking breaks from their work whenever they wanted." *Id.* Shortly after management informed the employees that the break-taking custom was gone and that the company would strictly enforce the rules, the employees left their workstations in protest and poured themselves coffee and sodas

while shouting and complaining at supervisors. *Id.* at 514. Flores, the plaintiff, was an apparent leader of the group and was eventually fired even though other employees broke the same rules that she broke. *Id.* But the Seventh Circuit reasoned that Flores was not required to show that she was meeting her employer's legitimate expectations:

> Flores admits that she broke the rules but claims that PTG disciplined her more harshly than non-Hispanic rule-breakers. It makes little sense in this context to discuss whether she was meeting her employer's reasonable expectations. None of the employees who joined the coffee room fracas were meeting PTG's reasonable expectations. PTG could have fired any or all of them. The issue in this case is whether Flores was singled out for discipline because she is Hispanic.

*Id.* at 515. The caveat to this theory of discriminatory enforcement is that, in *Flores*, the Seventh Circuit still held that the policy violation supplied a legitimate, nondiscriminatory justification for the plaintiff's termination. The company could not be expected to fire everyone involved in the coffee room rebellion and it "was well within its rights to make an example of the person [it] perceived was the Spartacus of the coffee room revolt." *Id.* More on that analysis later. The caveat notwithstanding, under *Flores*, in certain circumstances, plaintiffs arguing disparate discipline need not satisfy the legitimate expectations prong.

Like Flores, Miller contends that others violated the same policy. She paints a picture in which working off the clock was routine. As she sees it, Express merely used the violation as a means to the desired end. (As discussed later, the law refers to this as a "pretext.") Specifically, she contends that Ebonni Barfield used the violation to get Miller fired, even though Barfield herself violated the policy. This

11

argument was not well developed, but text messages in the record suggest that Barfield commonly texted Miller about store issues and did so at various times of the day. Dkt. 66-22. Barfield draws a narrow line of distinction between working off the clock and merely communicating about store issues off the clock. *E.g.*, Barfield Dep. 78, 121–22. The Court need not resolve the dispute at this point, however. For now, the Court reasonably infers that Barfield was either texting about work issues off the clock, or she was texting off-the-clock employees. And at this time, the Court must accept reasonable inferences in the light most favorable to Miller. *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 533 (7th Cir. 2013). So, at a minimum, Barfield texted other employees about work related issues while off the clock. That is enough to put in dispute whether others violated the same rule but were treated differently. And in some cases of disparate discipline, the legitimate expectations prong of the *McDonnell Douglas* framework need not be satisfied independently and instead merges with the similarly situated prong.

Express contends that Miller cannot point to any similarly situated employee outside of her protected class that was treated differently. The two sides offer starkly different viewpoints. Express argues that no comparator can exist because Miller was the only co-manager at the store. On the far end of the spectrum, Miller contends that every employee at the store is a potential comparator because the only factors that are relevant are whether they violated the same rule and whether they are outside of her protected class. Dkt. 71, at 14 (arguing that the "only distinction that matters here is whether an employee was under age 40 and subject

12

to the 'working off the clock' policy"). Notwithstanding this broad assertion, Miller concedes that the rest of the local management team was most similarly situated. She points to Barfield, Wright, and Romero.

The Court need not address Miller's broad assertion that every store employee may be a comparator. And Express' contention that no other employee is a comparator because Miller was the only co-manager is wrong. Still, on these facts, no proffered comparator suffices. The facts presented in the light most favorable to Miller tell a unique story in which a store manager seemingly gets a subordinate fired for violating a rule, one that the store manager herself (and others) also may have violated. But the Court need not determine whether other employees violated the rule because even if Miller's account is right, she still cannot prevail. No evidence suggests that the store manager's potential declination to "practice what you preach" was ever known to the decision makers. And facts giving rise to a comparison cannot create an inference of discrimination when those facts are not known to the decision maker.

In some cases of disparate disciplinary decisions, the similarly situated analysis can be more relaxed. In *Gordon v. United Airlines, Inc.*, only one other probationary flight attendant had ever been charged with the same violation—unauthorized deviation. 246 F.3d 878, 888 (7th Cir. 2001). Unlike Gordon, that employee, who was not a member of the same protected class, was not terminated. Instead, she was given a warning. *Id.* Though the "similarly situated" analysis often considers further factors, in *Gordon*, the Seventh Circuit limited its discussion to

other employees that had committed the violation but had been treated differently. Indeed, the court went on to explain that other employees may also be similarly situated because they violated a similar rule even though the violation had been classified differently; they had also missed flights unintentionally. *Id.* Unlike with Gordon, United classified those employees' violations as "missed flights" rather than "unauthorized deviations" and issued them warnings rather than terminations. *Id.* Based merely on the difference in treatment for similar violations, the Seventh Circuit determined that a triable issue of fact existed. *Id.*

*Gordon* evidences a somewhat narrow circumstance in which the second and fourth elements of the *McDonnell Douglas* framework necessarily merge into a single analysis. That situation exists when the plaintiff-employee admits to a violation but argues that other employees also violated the rule and were treated differently. In other words, the employee violated the legitimate expectations of the employer, but the result of the violation deviated from the result afforded other employees. At bottom, "[f]ederal employment discrimination laws do not limit their protection to perfect or even good employees. They also protect employees who misbehave or perform poorly." *Luster v. Ill. Dep't of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). In *Luster*, the Seventh Circuit reiterated that these plaintiffs need not point to identical comparators. Instead, "[f]or claims of discriminatory discipline, courts compare the similarity of misconduct, performance standards, qualifications, and disciplining supervisor." *Id.*

14

Here, Miller contends that other employees violated the same "working off the clock" rule but were treated differently. The text messages alone show that off the clock work conversations were commonplace among the small management team. So, from Miller's perspective, she was treated differently. Though she contends that all members of the store are potential comparators, she primarily points to the other members of the management team, including Barfield. In *Rodgers v. White*, the Seventh Circuit explained that although employees of different ranks often make poor comparators, the immediate supervisor there was the better comparator. 657 F.3d 511, 513 (7th Cir. 2011). "Thus, when a plaintiff and his supervisor were accused of making similar mistakes, were equally responsible for avoiding those mistakes, and were disciplined by the same superior, the plaintiff can make a realistic comparison with his supervisor for purposes of establishing a prima facie case of discrimination." *Id.* at 518.

Thus, Express' argument that Barfield cannot be a comparator is not correct. In some circumstances, Barfield's violation of the same or similar rule would make her a sufficient comparator. But the record contains no evidence to suggest that Barfield was ever accused of violating the prohibition against working off the clock, or any similar rule. The evidence shows she may have (depending on the interpretation of the rule), but that is not enough. Instead, the decision maker must know of that misconduct.

In *Rodgers*, both the employee and the supervisor were accused of the rule violation. That is important because it puts the ultimate decision maker on notice of

the facts giving rise to the comparison. And if facts giving rise to a comparison between differently treated employees is supposed to imply discrimination because of a protected class, then those facts must be known by the person responsible for making the adverse employment decision. In *Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 263 (7th Cir. 2014), the plaintiff offered no evidence that any "supervisor was ever told or otherwise aware" of the putative comparator's alleged violation. Citing to *Friedel v. Madison*, 832 F.3d 965, 974–75 (7th Cir. 1987), the Seventh Circuit explained that summary judgment is warranted even if the "comparator engaged in the same conduct because no evidence shows that defendant knew about [the] comparators' behavior." *Gaines*, 742 F.3d at 263.

Here, the record contains no evidence that Ruska, Maranelli, or Colpoys had any knowledge that anyone else had violated the rules. No one else was accused, and Miller apparently never brought it up herself. She merely accepted her termination and moved on. In the end, Express is wrong to claim that no comparator can exist when the store has only one co-manager. But on these facts, no comparator exists because no one was ever accused of violating the rules and the decision makers were not otherwise aware of any violations. *Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 958 (7th Cir. 2021) ("Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue.") (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018)). Thus, Miller has not met her

16

burden to prove her prima facie case, and Express is entitled to summary judgment.

Though Miller has not her burden, the Court continues and articulates an independent reason why Express is entitled to summary judgment. Express has proffered a legitimate, nondiscriminatory justification for terminating Miller's employment, and she offers no evidence of pretext in rebuttal. Express contends that Miller's violation of the working off the clock policy supplies the legitimate, nondiscriminatory justification for her termination sufficient to shift the burden to her to show pretext. Dkt. 53, at 9–10. Miller offers no response. Her brief entirely skips any argument in opposition and merely moves on to pretext. That alone would be enough for the Court to also move on. *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1075 (7th Cir. 2013) ("Because [plaintiffs] did not provide the district court with any basis to decide their claims, and did not respond to the defendant's arguments, these claims are waived.").

But regardless, Express has articulated a legitimate, nondiscriminatory reason. In *Flores v. Preferred Tech. Group*, 182 F.3d 512, 515 (7th Cir. 1999), the burden switched back to the plaintiff in the previously mentioned coffee room rebellion case to show pretext because the company had articulated a sufficiently legitimate, nondiscriminatory reason for firing her. The company believed her to be the instigator of the employees' demonstration—regardless of whether it was true. There, the Seventh Circuit explained, "PTG's burden of proof in this analysis is 'quite light,' and 'the mere articulation of the reason . . . puts the onus back on the plaintiff to prove pretext.'" *Id.* (quoting *Pilditch v. Bd. of Educ.*, 3 F.3d 1113, 1117

(7th Cir. 1993)). Here, Express has shown enough. Ruska and Colpoys both stated in their depositions that Miller's employment was terminated for violating a policy that Miller admits to violating. Maybe Miller thinks that decision was unjustified given the possibility that others were also violating it. But that question was not before the decision makers, and the Court does not sit as a super-human resources department. *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not site as a super-personnel department that reexamines an entity's business decisions."). The proffered justification is enough.

Even if Miller had met her initial burden, she cannot show that Express' legitimate, nondiscriminatory justification was pretextual. Miller contends that Barfield was biased against older-aged workers, expressed animus toward them, and "orchestrated" Miller's termination. Dkt. 71, at 16. Specifically, she invokes the cat's paw theory. That theory derives from a fable in which a monkey and a cat want to eat chestnuts that are roasting on a fire. Intent on not burning himself, the monkey manipulates the cat into retrieving the chestnuts, at the expense of the cat's burnt paw. The monkey eats the chestnuts; the cat gets only the burnt paw. *Staub v. Proctor Hosp.*, 562 U.S. 411, 416 n.1 (2011). In the employment discrimination context, the equivalent exists when an ill-intending supervisor that has no firing authority nevertheless persuades the decision maker to do his or her bidding and terminate the target's employment. *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012); *see also Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (genesis of the cat's paw theory in employment discrimination law).

18

In invoking the cat's paw theory, Miller appears to concede that Colpoys, Ruska, and Maranelli had legitimate, nondiscriminatory reasons for terminating Miller's employment. After all, if the decision makers held discriminatory animus toward Miller, then the cat's paw theory would not be necessary. And regardless, their justification was legitimate and nondiscriminatory. They fired her because she violated a company policy, which expressly stated that a violation would result in termination. Miller may have good reasons for believing the decision was wrong; she explained that she thought others violated the policy too. But to establish pretext, she must introduce evidence that the proffered justification is a lie. *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 721 (7th Cir. 2020); *Hobbs v. City of Chicago*, 573 F.3d 454, 461 (7th Cir. 2009). In *Green v. Nat'l Steel Corp.*, the Seventh explained pretext:

> This Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions.

197 F.3d 894, 899 (7th Cir. 1999). Miller offers no evidence that the decision was dishonest. She offers no evidence that others were accused of violating the rule, or that she brought up that argument with management, just to have it ignored. Thus, neither the undisputed facts, nor their inferences, can impute any dishonest motives onto the Express decision makers.

Instead, Miller attempts to establish pretext by arguing that Barfield used the decision makers to further her discriminatory agenda. Specifically, Miller contends that Barfield held animus views toward her because of her age. Miller

points to the allegedly ageist comments she heard Barfield make on three occasions. She further points to purported harassment that, in her mind, confirms the animosity: light scheduling on peak busy nights, telling others not to assist Miller in completing Miller's tasks, allegedly ostracizing Miller, excluding her from meetings, leaving her alone on the sales floor for long periods, and telling employees to ignore Miller's instructions. Dkt. 71, at 17. Under the cat's paw theory, however, the decision makers would have to seriously rely on the opinion of the subordinate supervisor, such that the subordinate supervisor exerts significant influence over the decision. *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 465 (7th Cir. 2016). In *Staub*, the Supreme Court applied the cat's paw theory and noted, "The one who makes the ultimate decision does so on the basis of performance assessments by other supervisors." 562 U.S. at 420. Quoting *Staub*, the Seventh Circuit explained, "Thus, an employer is liable where 'one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment action." *Boston*, 816 F.3d at 466.

But after the aid of discovery, the record is void of any evidence that Barfield exerted significant influence over the decision-making process, such that any purported animus caused Miller's termination. The only evidence Miller offers is that Barfield reported the violation and that she was in the room when Miller was informed of the termination decision. That is not remotely sufficient. No reasonable jury could infer that she exerted any influence; she simply did her job by reporting a violation and sitting in on a meeting in which her superiors fired a subordinate

20

employee for cause. "Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and 'discrimination law would be unmanageable if disgruntled employees . . . could defeat summary judgment by affidavits speculating about the defendant's motives.'" *Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).[3]

Even if Barfield exercised significant influence over the decision-making process, her comments are not sufficient evidence of discriminatory animus based on age. First, they are merely stray remarks. And second, case law instructs that these types of comments are not enough to impute ageist views. The remarks were essentially "out with the old, in with the new" type of remarks. Miller interpreted them to imply age rather than Barfield's potential desire bring in new employees generally and dispose of those hired by her predecessor. These stray remarks from a supervisor outside of the decision-making process are not enough to establish pretext. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 934 (7th Cir. 2020). Rather, the only evidence presented shows that the decision makers independently reached their decision. In *Marnocha*, an individual had made notes that the candidate was at the end of her career, and that he wanted to build for the next couple of decades. But the Seventh Circuit explained that the committee members acted independently, no witness testified that the individual shared those views, and that

---

[3] If merely being the bearer of bad news is insufficient to show personal involvement, then merely being in the same room is likewise insufficient. *See Protess v. Howell*, No. 95 C 2553, 1995 U.S. Dist. LEXIS 6102, at *10 n.2 (N.D. Ill. May 5, 1995).

the remarks nevertheless did not necessarily amount to ageist animus without more context. *Marnocha*, 986 F.3d at 721–22 ("We have previously explained that the description of a plaintiff as a 'later career person' is 'not an inevitable euphemism for old age.'").

Similarly, the comments attributed to Barfield are merely stray comments by a nondecision-maker that on their own do not show ageist animus. Barfield admitted to making similar comments, but also explained that she said those things to Miller in reference to getting rid of other low-performing employees. Furthermore, the Seventh Circuit explained that these types of comments are not enough:

> The plaintiffs' reliance on the 'out with the old, in with the new' statement allegedly made by either Kline or Reardon is also misplaced. First, neither Kline nor Reardon was involved in the decision making process that resulted in the plaintiffs' terminations (and served as the basis for their not being rehired). Kline was not a member of either selection panel and Reardon merely sat in on the selection panel meetings as a moderator of sorts. Thus, any statement made by either of these individuals that amounts to mere speculation as to the thoughts of the decisionmaker [is] irrelevant to an inquiry of discrimination. Second, even if Kline and Reardon could be characterized as decisionmakers for purposes of the plaintiffs' ADEA claims, there is nothing inherently discriminatory about the colloquialism 'out with the old, in with the new,' and the plaintiffs offer no evidence upon which a reasonable jury could infer that this phrase was used by Kline or Reardon in a discriminatory manner.

*Cerutti v. BASF Corp.*, 349 F.3d 1055, 1062–63 (7th Cir. 2003) (internal citations and quotations marks omitted); *see also Fortier v. Ameritech Mobile Communs.*, 161 F.3d 1106, 1113 (7th Cir. 1998) (comments of "new blood," "lot of energy," and "quick study" combined with the individual being terminated in his forties and

replaced by a twenty-six-year-old were not enough to support a determination of age bias); *Hoffman v. Rockford Pub. Schs.*, 2012 U.S. Dist. LEXIS 125902, at *5 (N.D. Ill. Sept. 5, 2012) ("While plaintiff puts much stock in her comment that it was 'out with the old, and in with the new,' such comment in the context of Sheffield being the new superintendent from outside the school system reasonably can only be seen as reflecting her view that it was time for change."); *Lackey v. Biomet Inc.*, No. 1:09-cv-363, 2011 U.S. Dist. LEXIS 80697, at *29 (N.D. Ind. July 25, 2011). Thus, the evidence is not sufficient to show any age bias.

One final note to put the nail in the coffin: the burden of establishing pretext is especially difficult in age discrimination claims brought under the ADEA, rather than a Title VII claim. Disparate treatment claims under the ADEA require the plaintiff establish that age discrimination was the but-for cause of the adverse employment action. *Marnocha*, 986 F.3d at 722 ("Emerging from the tangled details of this case, it is helpful to return to the burden on Marnocha. She must prove but-for causation; merely showing that 'age was *a* motivating factor' does not suffice."). Miller cannot show that any age discrimination was the but-for cause of her termination (even if it was a motivating factor), and so her claim must fail.

### c. Age Harassment

In Count II, Miller claims age harassment, otherwise known as a hostile work environment. The Seventh Circuit has not explicitly recognized this claim exists under the ADEA but has nonetheless assumed so. *Tyburski v. City of Chicago*, 964 F.3d 590, 600 (7th Cir. 2020) ("The determination whether a plaintiff

can bring such a claim can wait for another day, though."). To establish a hostile work environment claim under the ADEA, a plaintiff must prove (1) that she was harassed, (2) that the unwelcome harassment was based on age, (3) that the harassment was sufficiently "severe or pervasive so as to alter the conditions of her employment and create a hostile or abusive atmosphere," and (4) that a basis exists to hold the employer liable. *Id.* at 601.

Express argues that Miller cannot prove any harassment was based on age or that it was sufficiently severe or pervasive. Dkt. 53, at 13–14. In *Tyburski*, the Seventh Circuit held that the plaintiff was not subjected to a sufficiently severe or pervasive hostile work environment, so his harassment claim failed. Brian Sumner, a coworker, told him "he was too old and that people of Tyburski's age should not hold" the position he applied for. *Id.* at 595. Furthermore, Tyburski claimed that Sumner made ageist comments to him at "every opportunity." *Id.* Other coworkers made similar comments. *Id.* Furthermore, Tyburski claimed that Sumner had pushed him into a steel object, causing him to be injured, and that another coworker had encouraged Sumner to harass and intimidate Tyburski so that he would quit. *Id.* at 596. He also complained about being assigned menial duties. *Id.* Tyburski was then transferred to another location because he slammed a large wrench against a steel bench and exclaimed to his supervisor to stop harassing him. *Id.* at 596–97. His complaints continued at the new location. After noting that most of the complained-of conduct was done by coworkers rather than a supervisor (which

24

presents problems meeting the employer-liability element)[4], the Seventh Circuit explained that Tyburski had not proven that the comments were so pervasive or threatening to create a hostile work environment. *Id.* at 602.

As in *Tyburski*, Miller was not subjected to a hostile work environment. The facts paint a picture of personal disagreements between employees that did not like each other. At best, the facts show favoritism. That may be an unhappy work environment, but it is not a hostile one. Miller points to Barfield's comments. Dkt. 71, at 18. But insults, juvenile behavior, and personal animosity between coworkers is not enough to establish that the plaintiff was subjected to a sufficiently severe or pervasive hostile working environment. *Tyburski*, 964 F.3d at 602. And if the comments in *Tyburski* were not enough, then Barfield comments are not either. The comments made in *Tyburski* were unambiguously ageist. Thus, the "out with the old, in with the new" comments here are clearly not enough to show age bias and hostility sufficient for an ADEA harassment claim.

Miller further contends that the work environment was so bad and caused so much stress that she had to take a day off to see her doctor. She felt "ostracized and excluded from discussions and activities from the other Sales Leader Team members." Dkt. 71, at 18. As explained in further detail in the age discrimination section above, Miller also complained about how she was treated at work, being left alone to finish tasks, and being assigned only one other employee on busy nights. But none of that, even taken in the light most favorable to Miller, can possibly rise

---

[4] Express did not meaningfully argue this, so the Court will not discuss it.

to the level of severe and hostile. At best, the environment Miller describes was unhappy, juvenile, and petty. That is not a federal case. *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675 (7th Cir. 2005) ("In this case, Racicot has described a limited number of incidents that are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult.").

Here again, Express is entitled to judgment as a matter of law.

### d. Family and Medical Leave Act

In Counts IV and V, Miller asserts FMLA interference and retaliation. Express moves for summary judgment on both claims. But Miller abandoned her FMLA retaliation claim by declining the opportunity to respond to Express' summary judgment motion on that claim. *See Mach v. Will County Sheriff*, 580 F.3d 495, 498 (7th Cir. 2009) ("In his response brief, Mach abandoned five of the six arguments, leaving only the claim based on his transfer."); Dkt. 63, at 1 ("Ms. Miller hereby abandons her ADEA retaliation and FMLA retaliation claims."). Thus, only the interference claim under the FMLA remains.

Congress passed the FMLA in part "to entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601. Relevant to the facts in this case, a covered employee is entitled to twelve work weeks of leave during a rolling year to care for a parent suffering from a serious medical condition. § 2612(a)(1)(C). Under the Act, employers are prohibited from interfering with, restraining, or denying employee's legitimate exercise of their

26

FMLA rights. § 2615(a)(1). To establish a claim of FMLA interference, a plaintiff must prove that "(1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Valdivia v. Twp. High Sch. Dist. 214*, 942 F.3d 395, 398 (7th Cir. 2019). The plaintiff does not have to show that the employer acted with ill intent but merely that the employer deprived her of an FMLA entitlement. *Hickey v. Protective Life Corp.*, 988 F.3d 380, 387 (7th Cir. 2021).

### a. Element Three—Entitlement and the Medical Certification

Express argues that Miller cannot prove the third element, that she was entitled to leave under the FMLA. In support, it contends that Miller never submitted the necessary medical certification to create her entitlement. Dkt. 53, at 19. Indeed, the FMLA provides that the employee must provide a certification to the employer regarding the date of onset of the serious condition, the probable duration of the condition, the known and appropriate medical facts, and a statement that the eligible employee is needed for the care of her family member. 29 U.S.C. § 2613(b)(1)–(4). Additionally, the employee must provide the medical certification to the employer "in a timely manner." *Id.* § 2613(b). The Code of Federal Regulations further explains, "The employee must provide the requested certification to the employer within 15 calendar days after the employer's request, unless it is not practicable under the particular circumstances to do so despite the employee's

diligent, good faith efforts or the employer provides more than 15 calendar days to return the requested certification." 29 C.F.R. § 825.305; *Cloutier v. GoJet Airlines*, 996 F.3d 426, 442–43 (7th Cir. 2021). Although the employer must give notice to the employee regarding the consequences of the employee's failure to provide the certification, the employee bears the burden of timely furnishing the required certification. 29 C.F.R. § 825.305(d).

On November 30, 2017, Miller contacted Unum—Express' third-party FMLA administrator. She informed Unum of her intention to take FMLA leave beginning December 30, 2017.[5] Dkt. 55-12, at 50. Unum replied on December 1, 2017 via a standard mail letter. The letter provided Miller with Unum's contact information and informed her that a medical certification was due by December 15, 2017. The letter explicitly informed her, "We will be unable to approve your leave if the certification is not received by that date." *Id.* at 51. The letter then attached the required certification. *Id.* at 54–59. On December 18, 2017, Unum sent Miller another letter informing her that they had not received the necessary medical certification. They extended her deadline to December 22, 2017, and again informed her that failure to provide the certification would result in her FMLA leave request being denied. Dkt. 55-13, at 15. Having still received no response, Unum again sent Miller a letter on December 28, 2017, which again noted her failure to provide the necessary certification. This time, Unum explained that they had received an

---

[5] In her deposition, Miller explained that at the time of her call to Unum she was not aware of her options under FMLA and that she "was really just calling to see what the steps were, if [she] was eligible and that kind of thing." Miller Dep. 180:22–24, 181:1–3.

incomplete certification; it was apparently blank. So, Unum again extended her deadline to January 7, 2018, and again told her that a failure to provide the certification would result in her leave being denied. *Id.* at 18. Finally, on January 9, 2018, Unum sent Miller a letter explaining that her leave had been denied for failure to provide the required medical certification. *Id.* at 21. Notwithstanding these extensions, Miller was terminated on December 19, 2017. Miller Dep. 218:11–16.

Miller explained in her deposition that she had no memory of ever receiving any letters from Unum requesting a medical certification. Miller Dep. 185:8–11. Still, she conceded that the mailing address on the letters correctly matched her mailing address at the relevant time. *Id.* at 185:12–13. She further explained that the Unum representative that called her "told me that I would receive documentation once they checked to see whether or not I was eligible or something like that." *Id.* at 186:1–10. At some point, however, Unum was in contact with the medical facility responsible for Miller's care. That facility sent Unum a notice that it could not process the request because it needed additional patient identifying information, which it did not receive. *Id.* at 189:8–17.

Based on these facts, which are taken in the light most favorable to Miller, she was not entitled to FMLA leave. Unum sent her a notice on December 1, 2017, memorializing her FMLA request, which would begin on December 30, 2017. In that letter, Unum informed her in clear terms that she was expected to provide it with a medical certification regarding her need to care for her father. It gave her until

29

December 15, 2017 to provide that certification—fifteen days is the minimum time under the statute. Furthermore, the letter informed her that a failure to provide the certification would result in the denial of her requested FMLA leave. Though Unum was not required to offer any extensions, it gratuitously offered multiple extensions. Although the evidence suggests that Unum received a blank certification at some point later, Miller never met her burden of providing a sufficient certification.

In response, Miller explained that she cannot remember whether she received or read the letters, though she admitted in her deposition that she expected to receive some documentation from Unum. Instead of providing counter evidence, Miller instead contends she was fired before the certification process had been completed and that companies should not be allowed to fire employees before they finish the certification process. She believes that would directly contradict the purpose of the FMLA. Dkt. 71, at 9. But this argument misses the mark for two reasons. First, she was fired on December 19, 2017, and she was only entitled to fifteen days to complete the certification. She contacted Unum to inquire about FMLA leave on November 30, 2017, and it sent her the letter requesting the certification on December 1, 2017. Thus, the original deadline of December 15 afforded her sufficient time to respond, that deadline fell before her termination, and she never responded to it even after the deadline had passed. This is not a case in which the employer learns of an employee's requested leave and then fires her before she has a chance to submit the certification. And though she contends that she has no memory of receiving or reading Unum's letters, Miller bears the burden

30

of supplying the medical certification. 29 C.F.R. § 825.305(d). She cannot file for FMLA leave, ignore her mail, and then claim ignorance of the letters. That would dispose of her burden under the regulation entirely.

Second, notwithstanding Miller's December 19, 2017 termination, Unum continued with the process. It apparently didn't get the memo. Even after her termination, Unum offered Miller another extension of time on December 22, 2017, and did not deny her request until January 9, 2018. In other words, Unum completed the process and merely determined that Miller's request had to be denied for her own failure to supply the necessary certification.

### b. Element Five—Causation

Because Miller cannot satisfy the third element, Express is entitled to judgment as a matter of law on Miller's FMLA interference claim. Though her inability to prove the third element is sufficient reason to grant Express' motion, the Court continues. Express argues that Miller cannot satisfy the fifth element, that it did not deny her benefits to which she was entitled. In other words, it did not cause any denial of her FMLA leave. Dkt. 53, at 20. Indeed, causation supplies an independent reason why her claim fails.

Though not explicitly stated in the usually cited text, the fifth element requires causation. The employer's action must have been done because the plaintiff exercised her FMLA rights. *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 825 (7th Cir. 2011) (explaining that the first four elements were satisfied, and the only remaining question was whether the defendant denied reinstatement "because she

took FMLA leave"); *Barton v. Zimmer, Inc.*, 662 F.3d 448, 457 (7th Cir. 2011)

(affirming summary judgment because no evidence existed to show that defendant's

action were taken "because Barton took medical leave"). The text of the Code of

Federal Regulations further supports the causal requirement:

> Interfering with the exercise of an employee's rights . . . would also
> include manipulation by a covered employer to avoid responsibilities
> under FMLA, for example: (1) Transferring employees from one
> worksite to another *for the purpose of* reducing worksites, or to keep
> worksites, below the 50-employee threshold for employee eligibility
> under the Act; (2) Changing the essential functions of the job *in order to*
> preclude the taking of leave; (3) Reducing hours available to work *in
> order to* avoid employee eligibility.

29 C.F.R. § 825.220(b) (emphasis added). The use of the phrases "for the purpose of"

and "in order to" invoke a causal connection. The next section of the regulation

further invokes a causal requirement: "The Act's prohibition against interference

prohibits an employer from discriminating or retaliating against an employee or

prospective employee *for having exercised* or attempted to exercise FMLA rights." §

825.220(c) (emphasis added).

    Miller's argument is effectively that the store manager, Ebonni Barfield,

interfered with her FMLA rights by influencing the district and regional manager

into terminating Miller's employment because of her decision to file for FMLA leave.

She again invokes the cat's paw theory. Dkt. 71, at 10–11. Again, that theory "rests

on the agency relationship between an employer and a supervisor" and is invoked if

the supervisor—though not possessing decision-making powers—manipulates the

ultimate decision maker to serve his or her inappropriate purpose. *Brnovich v.

Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2350 (2021).

A couple days after contacting Unum, Miller spoke with Barfield in the back room of the Express store. She explained that she had called Unum "to see what my eligibility consisted of pertaining to FMLA, and I told her that it was because I had just found out that my father had lung cancer." Miller Dep. 182:7–24. She did not, however, report to the district manager, regional manager, or to Human Resources that she applied for FMLA leave. *Id.* at 184:6–11 ("Q. Did you tell anyone else other than Ebonni and Unum that you were taking FMLA leave, anyone at Express? A. At Express? Q. Yes. A. No."). Still, Barfield apparently notified her supervisors of Miller's intention. An email from the district manager to the regional manager explains, "After repeatedly asking for her restrictions Jackie has informed Ebonni that she has filed for FMLA." Dkt. 66-21, at 1.

Miller contends that Barfield acted poorly on learning of her intention to take FMLA leave. Dkt. 71, at 10. By "poorly," she means that Barfield said nothing and walked away. In her deposition, Miller explained that she told Barfield of her intention to take FMLA leave and that, without a physical or oral acknowledgement, Barfield "looked at me and walked away." Miller Dep. 182:19–24, 183:1–5. Miller believes this inaction constitutes a negative reaction to the news, biased Barfield against Miller, and caused her to use the "formal decision maker 'as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" Dkt. 71, at 10 (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013) and *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012)). In support of this cat's paw theory, Miller further explains that Barfield reported Miller's violations of company

policies very soon after hearing of Miller's intention to take FMLA leave, even though others were purportedly violating the same rules. Miller contends that these facts imply that Barfield was at least partially motivated by Miller's decision to pursue FMLA leave. But multiple problems doom this theory.

Even if the Court were to accept the thread-bare inference that Barfield was motivated by Miller's pursuit of FMLA leave, she supplies no evidence that Barfield duped anyone with decision-making authority over her FMLA claim. Unum, not the Express regional or district manager, was responsible for processing Miller's FMLA leave request. Unum denied that request, not the district or regional manager that Barfield was in contact with. And no evidence exists that Barfield had any contact with Unum in any way. If Miller means to argue that Barfield interfered by causing Miller's termination, that argument equally fails. The undisputed evidence shows that Miller's FMLA leave was not denied until January 9, 2018. In other words, her termination did not interrupt the FMLA process. On the contrary, Unum continued to send Miller letters after her termination and extended her deadline to file the medical certification after the deadline. Thus, this cat's paw theory must fail because no one at Express was involved the denial of Miller's FMLA claim; Miller, not Express, failed to provide the medical certification; and Unum's attempt to communicate with Miller and complete the FMLA process continued unabated even after Miller's termination.

Thus, the Court grants Express' motion for summary judgment on Miller's FMLA interference claim.

34

## III.    Conclusion

For the reasons explained above, the Court grants Express' motion [52] for summary judgment. Taking the facts in the light most favorable to Miller, Express is still entitled to judgment as a matter of law on Miller's age discrimination, age harassment, and FMLA interference claims. And Miller abandoned both of her retaliation claims.

Date:  August 24, 2021

                                                    Honorable Iain D. Johnston
                                                  United States District Judge